E-FILED
Wednesday, 05 March, 2008  01:41:11 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| BONNIE ROBINSON, Independent Administrator of the Estate of Michael J. Robinson, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )  No. 06-CV-3058 |
| DANIEL MORAN, et al., | ) ) |
| Defendants. | ) |

## **OPINION**

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on a Motion for Summary Judgment (d/e 147) filed by Defendants Steve Ashcraft, Dustin Finch, Sandra Funk, Mark Iseminger, Eric Reynolds, Steven Ruiz, Roger E. Walker, Jr., and Kevin Winters.[1]  Michael Robinson (Robinson), an inmate of Western Illinois Correctional Center (Western), was killed by his cell mate, Daniel Moran, on March 26, 2004.  On March 20, 2006, Plaintiff Bonnie Robinson (Plaintiff), administrator of the estate of Michael Robinson, filed the instant Complaint (d/e 1), alleging claims against

---

[1]The Court notes that Defendant Walker was dismissed from the case after the filing of the Motion for Summary Judgment.  See Text Order, dated October 5, 2007.  His request for summary judgment is, therefore, denied as moot.

twenty-three defendants in their individual and official capacities. Seven

defendants remain – Iseminger, Finch, Steve Ashcraft (Ashcraft),

Reynolds, Winters, Funk, and Steven Ruiz (Ruiz).[2]  Plaintiff asserts that

Defendants Iseminger, Finch, Ashcraft, and Reynolds exhibited deliberate

indifference to Robinson at the time of Moran's assault; that Defendants

Winters, Funk, and Ashcraft were deliberately indifferent when they ignored

cell change requests and visible injuries prior to the assault; and that all

seven of the remaining defendants engaged in a conspiracy to violate

Robinson's civil rights.  The parties have consented to a determination of

this case by the United States Magistrate Judge, pursuant to 28 U.S.C.

§ 636.  Order, dated January 11, 2008 (d/e 168).  For the reasons set forth

below, the Motion for Summary Judgment is denied as moot as it relates to

Defendant Walker and is allowed in all other respects.

## BACKGROUND

On March 26, 2004, cell mates Robinson and Moran fought to the

death on their cell wing during Day Room time.  Plaintiff's Response to

Defendants' Motion for Summary Judgment (d/e 157) (Plaintiff's

---

[2]While Defendants make arguments specifically relating to Defendant Skiles, the Court notes that Defendant Skiles has been dismissed from this action. See Text Order, dated October 20, 2006.

Response), p. 32, Additional Material Facts, ¶ 48 (not disputed in Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (d/e 167) (Defendants' Reply)). Moran killed Robinson by stabbing him with a homemade knife called a shank. Id. During the fight, Moran stabbed Robinson at least fifty times, leaving twenty-two stab wounds. Plaintiff's Response, p. 33, Additional Material Facts, ¶ 52 (not disputed in Defendants' Reply).

Western's R-1 housing unit, in which Robinson and Moran were housed in the B Wing, is built in the shape of an "X." In the middle of the X there is a control room, known as the "Bubble." Four housing wings, Wings A, B, C, and D, form the legs of the X. The Bubble is surrounded by a circular foyer. From the foyer, there are four glass doors leading to the four housing wings. Plaintiff's Response, p. 26, Additional Material Facts, ¶¶ 3-4 (not disputed in Defendants' Reply). Between the foyer and the B Wing is a glass wall and glass door, both of which are glass from floor to ceiling. When standing in the foyer looking into the wing, a guard can see both the upper and lower decks of the B Wing. The correction officer in the Bubble can see down any of the four wings by looking. Plaintiff's Response, p. 26, Additional Material Facts, ¶¶ 5-6 (not disputed in

Defendants' Reply). Day Room time is a time during which inmates can move freely in the wing. On March 26, 2004, the upper floor of B Wing had Day Room time from approximately 8:00 a.m. to 9:30 a.m. Plaintiff's Response, p. 30, Additional Material Facts, ¶ 33 (not disputed in Defendants' Reply).

Each cell at Western is equipped with a button, also called a buzzer, call button, emergency button, or panic button. These buttons are the only way that an inmate in a cell can contact the corrections officer in the Bubble. Plaintiff's Response, p. 26, Additional Material Facts, ¶ 7; Defendants' Reply, p. 2, Response to Additional Material Fact 7. Defendants concede that when a cell button is pushed and/or a cell door is opened, a light appears on a control panel in the Bubble. Defendants' Reply, p. 2, Response to Additional Material Fact 7. The parties dispute whether, when the cells are in "access mode" as they are during Day Room time, the button would only cause the control panel light to go on if the cell door is also opened. Viewing the evidence in the light most favorable to Plaintiff, however, the record reflects that the buttons work the same way on access mode as they do on lock down mode. See Plaintiff's Response, Ex. S, Deposition of Eric Reynolds (Reynolds Dep.), p. 69, 73-

74. Additionally, when viewed in the light most favorable to Plaintiff, the record reveals that activation of the cell button causes both a light and a beep on the control panel, although the volume of the beep can be manually turned down. See Plaintiff's Response, Ex. P, Deposition of Steven Ashcraft (Ashcraft Dep.), p. 60-61; Ex. W, Deposition of Steven Ruiz (Ruiz Dep.), p. 52. Plaintiff has produced evidence that, when the button is pressed and the light activates on the control panel, the Bubble officer has a duty to "alert the officer on the floor to check out and find out what the issue was." Ruiz Dep., p. 56. There is also evidence that the Bubble officer "has to respond" to the light activation. Id., p. 57. Defendant Ashcraft explained that, when the light activates on the control panel, usually the control officer will tell the wing officer that someone in cell such and such is pushing an emergency button and the wing officer will go check it out. Ashcraft Dep., p. 58-59. Ashcraft stated that the control officer could also activate a wing intercom and ask the inmate what the problem is. Id., p. 59-60. In any event, however, when the control officer receives an emergency button alert, someone is supposed to respond. Id., p. 60. Defendants concede that, during Day Room time, one appropriate way for an inmate with a safety concern to obtain a response

from the officer in the Bubble is to press the emergency button, although

Defendants assert that inmates can also come to the wing door during this

time. Plaintiff's Response, p. 31, Additional Material Facts, ¶ 36;

Defendants' Reply, p. 9-10, Response to Additional Material Fact 36.

Robinson and Moran were cell mates for six months prior to March

26, 2004. Plaintiff's Response, p. 26, Additional Material Facts, ¶ 16 (not

disputed in Defendants' Reply). Throughout the winter of 2003-2004,

Western inmate Walter Parker worried that Moran would obtain a knife and

hurt Robinson. Plaintiff's Response, Ex. F, Affidavit of Walter Parker

(Parker Aff.), ¶ 8. Parker asserts that he twice asked lieutenants to help

Robinson get a cell mate change. Specifically, Parker avers that, in

approximately February 2004, he asked Defendant Ashcraft to look into the

situation between Robinson and Moran. Id., ¶ 12. According to Parker, he

told Ashcraft that Robinson and Moran were about to fight and Robinson

was "gonna get hurt." Id. Defendant Ashcraft disputes this, asserting in an

affidavit that he was never told by another inmate that Moran and Robinson

were not getting along or had previously fought one another. Defendants'

Material Facts Claimed to be Undisputed (d/e 148) (Defendants'

Page 6 of 62

Undisputed Facts), Attachment 1, p. 7-10, Affidavit of Steven Ashcraft,
¶ 18.

Plaintiff asserts that, approximately two to five weeks prior to
Robinson's death, Moran and Robinson had a fist fight during Day Room
time and corrections officers did not respond in any way. Plaintiff's
Response, p. 28, Additional Material Facts, ¶ 18. Defendants deny that
they knew of any prior fight between Robinson and Moran and contend that
there is no evidence that any of the Defendants were in the cell house at
the time of the prior fight. Defendants' Reply, p. 5, Response to Additional
Material Fact 18. Western inmate Don Green avers that also, about two to
five weeks prior to Robinson's death, he observed Moran and Robinson
ask an unidentified officer for a cell change. Plaintiff's Response, Ex. B,
Affidavit of Don C. Green (Green Aff.), ¶ 4. According to Green, the officer
responded "if you aren't getting along, just throw a punch, just fight your
way out." Id.

Inmate John Linboom asserts that one to three weeks prior to
Robinson's death, Robinson exhibited an injured and swollen face after
being hit by Moran with a night lamp during a fight. Plaintiff's Response,
Ex. C, Affidavit of John Linboom (Linboom Aff.), ¶ 3. Another inmate,

3:06-cv-03058-BGC # 172 Page 8 of 62

Herbert Hope, avers that "a couple of weeks before Robinson's death, Robinson and Moran fought in their cell. Moran had scratches on his face after that fight." Plaintiff's Response, Ex. H, Affidavit of Herbert Hope (Hope Aff.), ¶ 3. According to Hope, a couple days before Robinson's death, he observed Robinson and Moran ask an unidentified Lieutenant for a cell change. Id., ¶ 2. Hope asserts that the Lieutenant responded "Fight, fuck or get along." Id.

Inmate Richard Corder avers that in the weeks prior to March 26, 2004, he observed Robinson put requests for cell changes in the mail slot where inmates were supposed to place such requests. Plaintiff's Response, Ex. A, Affidavit of Richard Corder (Corder Aff.), ¶ 3. According to Corder, on March 24 or 25, 2004, Robinson showed him "a lot of request slips" and told him that he was trying to change his cell mate. Id., ¶ 2. Corder further asserts that he observed Robinson ask both a Sergeant and a Lieutenant to move him, and that he overheard Robinson tell a Lieutenant, "All you are doing is stalling. You're moving all of the white boys, but you won't move me." Id., ¶¶ 6-7.

The March 26, 2004 fight between Moran and Robinson began inside cell 52 and moved along the upper gallery past cells 53, 54, 55, 56, and

Page 8 of 62

57. Plaintiff's Response, p. 33, Additional Material Facts, ¶ 53;

Defendants' Reply, p. 13, Response to Additional Material Fact 53

(disputing only the distance between cells 53 and 58). The fight ended in

cell 58, with Robinson lying dead face down with his upper torso in the

gallery and his lower torso in cell 58. Id. Plaintiff estimates the distance

between cells 53 and 58 to be approximately thirty yards, while Defendants

assert that the distance is approximately forty to fifty feet. Several inmate

witnesses assert that, while Robinson was lying half in and half out of cell

58, Moran took several steps away and then returned and kicked Robinson

hard in the head or face. See Plaintiff's Response, Ex. C, Linboom Aff., ¶

14; Ex. D, Affidavit of Gary Maas (Maas Aff.), ¶ 14. The inmates aver that,

after Moran kicked him, Robinson tried to push himself up on his hands but

collapsed and died. Plaintiff's Response, Ex. D, Maas Aff., ¶ 15.

There is also a dispute as to the length of time the men were fighting.

According to Plaintiff, "[t]he fight between Robinson and Moran took at

least 4-5 minutes or maybe 10-15 minutes or maybe 15 or 16 minutes or at

most 20-25 minutes between 8:45 a.m. and 9:15 a.m. on March 26, 2004."

Plaintiff's Response, p. 33, Additional Material Facts, ¶ 49. This is based

on a compilation of statements by inmates who witnessed the fight. Inmate

Green avers that at approximately 9:00 a.m., he "heard the sound of a loud crash as a t.v. busted."   Plaintiff's Response, Ex. B, Green Aff., ¶ 5. According to Green, Robinson and Moran fought for approximately fifteen or sixteen minutes after the loud crash.  Id., ¶ 7.  Inmate Linboom avers that the fight lasted at least four to five minutes.  Plaintiff's Response, Ex. C, Linboom Aff., ¶ 10. Inmate Edward Pickett estimates that the fight took twenty to twenty-five minutes.  Plaintiff's Response, Ex. E, Affidavit of Edward Pickett (Pickett Aff.), ¶ 3.  Inmate James Cehoda avers that the fight lasted ten to fifteen minutes.  Plaintiff's Response, Ex. G, Affidavit of James Cehoda (Cehoda Aff.), ¶ 5.  Inmate Hope states that the fight took place between 8:45 and 9:15 a.m.  Plaintiff's Response, Ex. H, Hope Aff., ¶ 4.

Defendants assert that the fight could not have taken more than ten minutes and did not occur prior to 9:05 a.m. when Defendant Finch performed a check of B Wing.  Finch was the Wing Officer for Wings A and B at the time of the fight.  Plaintiff's Response, Ex. Q, Deposition of Dustin Finch (Finch Dep.), p. 44.  According to Finch, the Wing Officer is required to do a routine wing check approximately every thirty minutes and is required to write down the time at which he entered the wing on a wing

check log, which is located on the wing.  Id., p. 44-45, 48.  Finch testified

that during a routine wing check, he would walk past each cell on a wing.

Id., p. 50.  According to Finch, a routine wing check would take

approximately two to three minutes when the inmates were on lock down

and approximately three to five minutes during Day Room time.  Id., p. 52.

After examining the wing check log for Wing B for March 26, 2004, Finch

testified that he performed a routine wing check at 8:35 a.m. that day,

during which all was secure.  Finch stated that he stayed in the foyer for

the period of time between 8:35 a.m. and 9:05 a.m.  Id., p. 54.  Finch

testified that, while serving as the wing officer for Wings A and B, he would

go directly from checking Wing A to check Wing B and then return to the

foyer.  Id., p. 105.  Finch testified that he performed a routine wing check

and signed the wing check log for Wing B at 9:05 a.m. on March 26, 2004,

and at that time all was secure on Wing B.  Id., p. 53. Finch testified that he

exited Wing B at 9:06 a.m., returning to the foyer where he sat down in a

chair with his back to the wing.  Id., p. 56-57.  Finch stated that he sat in

the chair with his back to the wing for approximately five minutes during

which time he heard "day room activity going on," specifically "Inmates

talking, moving around on the wing."  Id., p. 57.  During the five minutes,

Finch testified that he talked to Defendant Iseminger, but did not recall what they discussed. Id. According to Finch, Iseminger was also seated in a foyer chair with his back to Wing B during their conversation. Id., p. 58. Finch further testified that Defendant Ashcraft was in the foyer during this time but was not talking to Finch. Id., p. 60.

Finch testified that he and Iseminger ended their conversation when two unidentified inmates came to the door to Wing B and said that another inmate needed medical attention. Finch Dep., p. 58-59. According to Finch, he, Iseminger, Skiles, and Ashcraft responded and immediately went to the spot of the incident. Id., p. 60. Finch testified that the four men entered Wing B at 9:10 a.m., but later stated that it was closer to 9:15 a.m. Id., p. 61, 84. Finch testified that when he responded he saw blood on the floor and Robinson kneeling and holding his chest. Id., p. 67. According to Finch, he determined that Robinson was still alive at this time, because he observed Robinson holding his chest and breathing. Id., p. 78-79. Finch further testified that he observed Robinson turn himself around while on his knees, clutching his chest and gasping for air. Id., p. 90-91.

Finch testified that he immediately went to lock down the wing and that he specifically locked Moran into cell B52. Finch Dep., p. 67, 69. At

that time, Finch suspected that Moran had killed Robinson because he observed blood all over Moran's hands, chest, and back. Id., p. 69-70. According to Finch, in securing the wing, he, Iseminger, and Skiles directed the inmates into their cells and shut the doors. Id., p. 70. Finch stated that he made an entry in the wing check log timed 9:15 a.m. that indicated "not secure," fight and cell B52. Id., p. 61-62. According to Finch, he made this entry after the wing was secured. Finch testified that 9:15 a.m. did not represent the time at which he made the entry, but rather the time at which he noticed that there was a fight on the wing. Id., p. 72-73. According to Finch, he made a subsequent entry in the wing check log at 9:25 a.m., noting "all secure" and another at 9:35 a.m. in connection with a routine wing check. Id., p. 76. Finch testified that he came off of the wing at 9:25 a.m. and then returned to do the 9:35 a.m. wing check. Id. Finch testified that, after the wing was secured, at approximately 9:25 a.m., he saw Robinson again. Id., p. 79-80. At this point, Finch observed Robinson lying face down in a pool of blood with his upper torso inside cell 58 and the remainder of his body in the gallery. Id.

Defendant Iseminger testified in his deposition that the fight must not have been that long because he had been on Wing B "ten to fifteen

3:06-cv-03058-BGC # 172 Page 14 of 62

minutes before" he reentered it with the two inmates, Finch, and Ashcraft. Plaintiff's Response, Ex. R, Deposition of Mark Iseminger (Iseminger Dep.), p. 72. At the time of Robinson's death, Iseminger was "working a foyer" in Housing Wing R1. Id., p. 20. According to Iseminger, his responsibilities included signing inmates in and out of the unit and signing cleaning products out to porters. Id., p. 21. According to Iseminger, at approximately 9:15 a.m. on March 26, 2004, two inmates came off B Wing and stated that someone needed medical attention. Id., p. 28. Iseminger testified that he had been on Wing B ten to fifteen minutes prior to this time to remind an inmate that he was set to appear before a parole review board at 10:30 a.m. that morning. Id., p. 76-77. According to Iseminger, there was not a fight going on in the wing when he was on it. Id., p. 89. Additionally, Iseminger stated that he did not hear anything that sounded like a fight between the time that he was on the wing talking to the inmate and the time the two inmates came off Wing B. Id.

Iseminger testified that at the time the two inmates came off Wing B, Ashcraft was exiting his office in the foyer. Iseminger Dep., p. 32. Iseminger did not recall where Finch was when the inmates came off the wing. Id., p. 30. Iseminger testified that, after the inmates came to the

Page 14 of 62

door, he, Ashcraft and Finch went into the wing. Id., p. 29-30. According to Iseminger, the minute the men reached the top of the stairs and saw Robinson, Ashcraft called "Code 3" to indicate a medical emergency and then told Iseminger to secure the wing. Id., p. 51, 88. Iseminger began to do so, and Ashcraft stayed with Robinson. According to Iseminger, Robinson was lying motionless with the upper part of his body in the cell and his legs out of the cell. Id., p. 42. Iseminger testified that medical personnel arrived while he was locking down the wing. Id., p. 53-54. Iseminger estimated that it took approximately ten minutes to secure the wing. Id., p. 54. Iseminger testified that after the wing was secure, he, Finch and other unidentified corrections officers began going from cell to cell to look for blood or marks on other inmates. Id., p. 55-56.

It is undisputed that, from the foyer surrounding the Bubble, guards are able to see the upper gallery of the B Wing as it runs outside cells 52 through 58 and to hear yells from B Wing. Plaintiff's Response, p. 27, Additional Material Facts, ¶¶ 12-13 (not disputed in Defendants' Reply). Defendant Iseminger, however, testified that it is hard to hear noise from the wings while in the foyer "because there's pretty thick glass between the wing and the foyer." Iseminger Dep., p. 35. Plaintiff asserts that, early in

the fight, Robinson threw or crashed a t.v. onto the floor near cell 52.

Plaintiff's Response, p. 33, Additional Material Facts, ¶ 50. According to

Iseminger, all of the televisions on the wing are the same size. Iseminger

Dep., p. 87. He described them as small, and estimated that they might be

thirteen inch t.v.s. Id., p. 87-88. Inmates Green and Pickett aver that the

crash was loud enough to be heard by corrections officers in the Bubble.

Plaintiff's Response, Ex. B, Green Aff., ¶ 5; Ex. E, Pickett Aff., ¶ 6. The

record also reveals that, during the fight, there was loud yelling by the

inmates and loud sounds of fighting. See, e.g., Plaintiff's Response, Ex. B,

Green Aff., ¶ 7; Ex. D, Maas Aff., ¶ 10; Ex. E, Pickett Aff., ¶ 11; Ex. G,

Cehoda Aff., ¶¶ 5, 7. There is, however, no evidence that any of the

Defendants heard the crash, the yelling, or the other noise associated with

the fight.

Inmate Maas asserts that, at approximately 9:00 a.m. on March 26,

2004, he heard a very loud smash and came out of his cell to see two

inmates fighting. Plaintiff's Response, Ex. D, Maas Aff., ¶ 3. Maas also

observed many inmates leaning and hanging on the rails to watch the fight.

Maas asserts that inmates are not allowed to lean or hang on the rails, and

usually, if an inmate hangs on the rails a corrections officer from the

Bubble stops him.  Id., ¶ 4.  Maas avers that from approximately 9:00 a.m. to 9:10 a.m., he could see both the fight and the Bubble.  Id., ¶ 5.  Maas asserts that during this time, he observed one corrections officer in the Bubble and three or four officers by the desk.  Id., ¶ 5.  According to Maas, these officers "did nothing during this time period."  Id., ¶ 6.  Maas avers that when Robinson and Moran were fighting in front of cell 55, he pushed his panic button.  Id., ¶ 8.  According to Maas, Robinson died at 9:10 a.m. and lay dead from 9:10 a.m. until 9:15 a.m. before officers came to the scene.  Id., ¶¶ 16-17.  Inmate Hope avers that an unidentified corrections officer entered Wing B early in the fight, looked at Robinson who was bleeding from his neck, and left the wing smiling and laughing.  Plaintiff's Response, Ex. H, Hope Aff., ¶ 5.  According to Hope, during the time Robinson and Moran were fighting, "the Corrections Officers were playing cards and some were playing handball."  Id., ¶ 7.  Inmate Corder avers that, during the time of the fight, he looked towards the foyer and Bubble and observed four or five corrections officers talking to one another and flirting with a female.  Plaintiff's Response, Ex. A, Corder Aff., ¶¶ 12-13. According to Corder, the corrections officers were not looking at the fight or paying any attention to the wing at all.  Id., ¶ 12.  Inmate Green avers that

during the fight, he could see four corrections officers in the Bubble,

"standing together talking with their backs to the fighting and noise in our

wing." Plaintiff's Response, Ex. B, Green Aff., ¶ 7. According to Green,

there were no corrections officers on B Wing throughout the entire time of

the fight between Robinson and Moran. Id., ¶ 8.

During the time of the fight, Defendant Reynolds was the officer in

the Bubble, where the control panel is located. Plaintiff asserts that

Reynolds was seated with his back turned to the fight during the entire

fight; Reynolds contends that he does not know which way he was facing

during the fight. Plaintiff's Response, p. 35, Additional Material Facts,

¶ 61; Defendants' Reply, p. 15, Response to Additional Material Fact 61.

Inmate Cehoda avers that he could observe the officer in the Bubble during

the fight and the officer had his back turned to the fight. Plaintiff's

Response, Ex. G, Cehoda Aff., ¶ 8. Reynolds testified that, from

September 2003 through March 2004, he was assigned to Housing Unit R-

1 and mainly worked in the Bubble. Plaintiff's Response, Ex. S, Deposition

of Eric Reynolds (Reynolds Dep.), p. 16. According to Reynolds, on March

26, 2004, at 8:00 a.m. he placed the top deck of B Wing on access mode

to begin Day Room time. Id., p. 51. In access mode, inmates "can punch

Page 18 of 62

themselves out" of their cells.  Id.  Reynolds testified that he left the cells on access until 9:30 a.m.  Id., p. 56-57.  Reynolds testified that, when he was on duty as the Bubble officer and a cell buzzer light activated, his usual response was to look in the direction of the cell to see if there was anything going on.  Id., p. 71.  If he did not see a problem, he would "sometimes" clear the light and wait to see whether it was reactivated.  Id., p. 71-72.  If it was not reactivated, Reynolds would conclude that it was a "false alarm."  Id., p. 72.

Reynolds testified that, at approximately 9:15 a.m.,he heard Defendant Ashcraft signal a medical emergency on the radio.  Reynolds Dep., p. 61.  According to Reynolds, he did not know anything unusual was going on until Ashcraft called medical emergency.  Id., p. 62.  Reynolds testified that, between 8:25 a.m. and 9:15 a.m, he observed "regular ongoings" on B Wing while he was doing paperwork.  Id., p. 62-64.  According to Reynolds, he would visually observe B Wing every two to three minutes.  Id., p. 66.  Reynolds testified that he does not recall whether, between 8:00 a.m. and 9:30 a.m. on March 26, 2004, any red lights went off to indicate an inmate activating the cell emergency button.  Id., p. 69.

During the time of the fight, Defendant Ashcraft was the Lieutenant working the R-1 Housing Unit. Plaintiff's Response, p. 30, Additional Material Facts, ¶ 30 (not disputed in Defendants' Reply). Ashcraft has been employed by the Illinois Department of Corrections (IDOC) since January 1989. Plaintiff's Response, Ex. P, Deposition of Steven Ashcraft (Ashcraft Dep.), p. 10. According to Ashcraft, the Lieutenant is the highest level supervisor on-site in a housing unit. Id., p. 32. From September 2003 through March 2004, Ashcraft served as a cell house supervisor for R-1. Id., p. 12. In that position, Ashcraft was authorized to take cell change requests from inmates, although he was not authorized to make a cell change. Id., p. 13-14. According to Ashcraft, from September 2003 through March 2004, cell change requests were made on yellow colored forms. Inmates could place the forms in an intra-facility mail box located on the wings, although Ashcraft preferred that the forms be handed to him, so that he could deliver them to Western's placement assignment office. Id., p. 17-18. Ashcraft testified that, from September 2003 through March 2004, he recalled transmitting cell change requests to Western's placement assignment office several times a week. Id., p. 15-16. Ashcraft further testified that inmates also had the option of refusing housing, if the

3:06-cv-03058-BGC  # 172  Page 21 of 62

situation "was so bad," in which case the inmate who refused housing

would be placed in segregation. Id., p. 14. According to Ashcraft,

> If it was such a big issue that neither one of them could stay
> together, they were going to fight, just couldn't live together,
> then it was handled right there. One of them or both of them
> would be placed in segregation. That's the quickest way to
> separate the two and alleviate a problem. If they both voiced
> no we can hang on for a few days until we get a cell change,
> we will be fine, then we go through placement with the request
> slip.

Id., p. 19-20. Ashcraft testified that cell changes through the placement

office were usually done within forty-eight hours. Id., p. 20. According to

Ashcraft, one of the grounds for a cell change was known physical contact

between cell mates. Id.

Ashcraft testified that he never received a cell mate change request

form or an oral request for a cell mate change from either Robinson or

Moran. Ashcraft Dep., p. 23. Furthermore, according to Ashcraft, he never

received a cell mate change request from another inmate acting on behalf

of either Robinson or Moran, nor can he recall being informed by an inmate

that Robinson needed a new cell mate. Id., p. 23-24. However, as

previously noted, Plaintiff has produced the affidavit of inmate Parker who

avers that, in approximately February 2004, he specifically asked

Defendant Ashcraft to look into a cell mate change for Robinson and told

Page 21 of 62

Ashcraft that Robinson was "gonna get hurt." Plaintiff's Response, Ex. F, Parker Aff., ¶ 12.

Ashcraft testified that, on March 26, 2004, at approximately 8:15 a.m. he did a wing check of B Wing and signed the B Wing log book. Ashcraft Dep., p. 73-74. Ashcraft testified that, shortly after 9:00 a.m. on March 26, 2004, he was coming out of his office into the foyer for routine business. Id., p. 88. Ashcraft described the lieutenant's office as a closed-in office "in between A and B wing in the foyer," with one door that looked out into the control room. Id., p. 41. According to Ashcraft, he was summoned to B Wing as he entered the foyer area from his office. Id., p. 82. Ashcraft explained that he saw two inmates on B Wing waving and yelling that a guy needed help. Id., p. 83-84. Ashcraft testified that he yelled to the control room to open the wing door. Id., p. 84. Ashcraft testified that, when the wing door was opened, he was the first correctional officer on the wing. Id., p. 84-85. Ashcraft testified that he proceeded to the stairs and up to the first landing when he noticed a broken t.v. and blood smears. Id., p. 85.

According to Ashcraft, as he proceeded farther up the stairs, he observed legs hanging out of a cell. Ashcraft Dep., p. 88-89. Ashcraft

testified that he went down the wing, looked in the cell, and saw an inmate lying face down. Id., p. 89. According to Ashcraft, he was the first corrections officer to reach the inmate, and he immediately called a "code 3" on his radio to signal a medical emergency on the wing. Id., p. 89-90. Ashcraft testified that he then noticed injuries consistent with a puncture wound on Robinson's back and biceps. Id., p. 101. Ashcraft testified that, at that point, he ordered the wing to be locked down. Id. According to Ashcraft, when he approached Robinson, Robinson was making a gurgling sound from his throat and made an attempt to move upward with his shoulders. Id., p. 103-04. Ashcraft testified that, when he reached Robinson, he put on gloves and attempted to find Robinson's pulse, but was unable to locate one. Id., p. 105. According to Ashcraft, Robinson's body felt warm and was pliable. Id., p. 105-06. Ashcraft testified that the first healthcare worker to respond to the scene, Nurse Moore, arrived at approximately 9:17 a.m. Id., p. 107-08.

Defendants concede that, during the time the fight was going on, none of the officers on duty in the Bubble and foyer did anything to stop the fight, to check the housing wing, or to protect Robinson. Plaintiff's Response, p. 36, Additional Material Facts, ¶¶ 66; Defendants' Reply, p.

Page 23 of 62

16-17, Response to Response to Additional Material Fact 66. Defendants further concede that corrections officers are expressly prohibited from loitering in the foyer during Day Room time. Plaintiff's Response, p. 27, Additional Material Facts, ¶ 15; Defendants' Reply, p. 4-5, Response to Additional Material Fact 15.

At the time of Robinson's death, Defendant Funk was the Assistant Warden of Programs at Western. She does not recall meeting either Moran or Robinson prior to March 26, 2004. Defendants' Undisputed Facts, ¶ 1; Plaintiff's Response, p. 2. Funk became involved in the case after Robinson's death, when she was called in to work after being away on personal time. Funk notified Plaintiff of Robinson's death and spoke with Plaintiff on several occasions. Defendants' Undisputed Facts, ¶¶ 2-3; Plaintiff's Response, p. 2. Funk avers that, prior to being called into Western on March 26, 2004, she was not aware of any problems between Moran and Robinson. Defendants' Undisputed Facts, Attachment 1, p. 1-2, Affidavit of Sandra Funk, ¶¶ 13-14. Plaintiff disputes this, relying on the Affidavit of inmate Richard Corder, in which Corder avers that Robinson put written cell mate requests in the appropriate mail slot for many days prior to March 26, 2004. According to Corder, Robinson told him that he

went through all the proper procedures for a cellmate change and asked "the Sergeant and the Major and the Assistant Wardens and the Warden." Plaintiff's Response, Ex. A, Corder Aff., ¶¶ 4-5.

Funk was Western's contact person and was assigned the task of notifying Plaintiff of her son's death. Plaintiff's Response, Ex. J, Deposition of Sandra Funk (Funk Dep.), p. 8. Funk testified that she did this on March 26, 2004. Id. According to Funk, because the matter was under investigation, she could not reveal "everything" to Plaintiff. Id., p. 11. According to Funk, IDOC Deputy Director Orr and Mr. Molina advised her as to what she could and could not reveal. Id.

Funk testified that she again spoke to Plaintiff by telephone on March 27, 2004, between 7:49 a.m. and 7:55 a.m. Funk Dep., p. 6. At this time, Funk was at the hospital, getting ready to attend Robinson's autopsy. Id., p. 7. After the autopsy, Funk spoke to Plaintiff again and informed her that Robinson "died as a result of a stab wound resulting from the fight between the two offenders." Id., p. 12. Plaintiff asked Funk why there were no guards there to protect Robinson. Id., p. 16. Funk responded that there were officers in the unit. Id., p. 16, 22. Funk testified that, due to the on-going investigation, she did not inform Plaintiff that the person who had

killed Robinson was his cell mate. <u>Id</u>., p. 18. Funk testified that she spoke to Plaintiff a third time on March 27, 2004. <u>Id</u>., p. 28. During this conversation, Plaintiff asked if she would receive copies of "reports," and Funk explained that, because the investigation was on-going, she could not give her any information at that time. <u>Id</u>., p. 28-29.

On March 31, 2004, Funk again spoke to Plaintiff by telephone. <u>Funk Dep.</u>, p. 31. According to Funk, Plaintiff stated that approximately one month before "Michael and his celly had gotten into it" and the cell mate, who was Hispanic, had "cut" Robinson. <u>Id</u>. Funk testified that Plaintiff told her that Robinson had said that it was nothing to worry about. <u>Id</u>., p. 32. Funk testified that she is sure that she reported this information to the warden. <u>Id</u>., p. 33. On April 9, 2004, Funk again spoke to Plaintiff by telephone. <u>Id</u>., p. 44-45. At this point, Plaintiff asked Funk if she could attend the coroner's inquest into Robinson's death and when it would be held. <u>Id</u>., p. 45, 47-48. Funk testified that she does not recall whether she answered these questions, but stated that it was her understanding that the inquests are public hearings. <u>Id</u>., p. 46. Funk further testified that Plaintiff asked her whether the person who was in custody for killing her son was white or black, to which Funk responded, "neither." <u>Id</u>., p. 50.

Page 26 of 62

Funk testified that, on April 12, 2004, she spoke with the coroner, and during this conversation, Funk may have mentioned that Plaintiff wanted to attend the inquest. Funk Dep., p. 49. According to Funk, she then contacted Plaintiff to explain that the inquest would be held after the autopsy reports were received. Id., p. 49-50. Funk told Plaintiff that she would notify her when the inquest was set. Id., p. 50. Funk's notes of the conversation reflect that Plaintiff inquired whether the killer was in the cell with Robinson, and if so, how long was his sentence and how much time did he have left to serve. Id., p. 56. Funk indicated to Plaintiff that she would write these questions down and get back to her. Id. Funk, however, testified that she does not recall having any conversations with the Plaintiff after the one on April 12, 2004. Id., p. 55.

On April 1, 2004, a Labor Management Meeting was held at Western. A redacted copy of the minutes from this meeting are part of the record. Plaintiff's Response, Ex. K. They reveal that Assistant Wardens Funk and Zimmerman were present along with Major Steven Ruiz and Major Penny Ruiz, who at the time were married. Id.; Funk Dep., p. 62-63. Funk does not dispute that, at this meeting, she announced that "all the staff need to be commended on their handling of the homicide. They have

Page 27 of 62

been complimented by outsiders on the way it was handled by Western's staff" and "On behalf of the administration we would always [sic] like to compliment you." Id., p. 63-64. It is undisputed that Funk was not involved in the investigation into Robinson's death and was not privy to all information resulting from the investigation. Defendants' Undisputed Facts, ¶ 6; Plaintiff's Response, p. 2. The minutes also reflect a statement from Assistant Warden Zimmerman that "everybody looked and acted very professional." Plaintiff's Response, Ex. K, p. 3.[3] The minutes also reflect information regarding a "Southern Steel Visit." Id., p. 2. Southern Steel is the company that installed the electronics in the housing units. Funk Dep., p. 71. According to the minutes, it was discussed that "As much as the control panel doesn't work, it did give us an accurate timeline on the incident last Friday." Plaintiff's Response, Ex. K, p. 2. Funk does not dispute that she stated that "this will support our staff if it is ever questioned." Id.; Funk Dep., p. 76-77. Funk testified that it was her understanding that the timeline accurately recorded the time that the door between the foyer and the wing was opened to let corrections officers onto

---

[3]Because Exhibit K has been redacted, the Court will reference Exhibit K by the page numbers assigned by the electronic filing system, rather than the document's internal page numbers.

Page 28 of 62

the wing. Id., p. 77. It is undisputed that this timeline or printout showing the door opening and closing has disappeared and its disappearance cannot be explained by the Defendants. Plaintiff's Response, p.43, Additional Material Facts, ¶ 108; Defendants' Reply, p. 23-24, Response to Additional Material Fact 108.

The Brown County coroner's inquest into Robinson's death was held on October 5, 2004. Plaintiff's Response, Ex. M, Transcript of Proceedings before Coroner and Coroner's Jury (Coroner's Jury Transcript). Plaintiff attended the proceeding. Plaintiff's Response, Ex. I, Affidavit of Bonnie Robinson, ¶ 4. It is undisputed that the coroner wanted someone from Western to appear and testify as to the circumstances of Robinson's death. Plaintiff's Response, p.41, Additional Material Facts, ¶ 94; Defendants' Reply, p. 21-22, Response to Additional Material Fact 94. Major Steven Ruiz appeared as a witness. Coroner's Jury Transcript, p. 3. Ruiz was employed by Western on March 26, 2004 and assigned to the 11 p.m. to 7 a.m. shift. Defendants' Undisputed Facts, ¶¶ 28-29; Plaintiff's Response, p. 2. Ruiz was not at the institution at the time of Robinson's death, however, he was called in to work after the death. Defendants' Undisputed Facts, ¶ 30; Plaintiff's Response, p. 2. Ruiz met with the crime

scene technician and accompanied him while he processed the scene of the death; Ruiz was not involved in the investigation to any other extent. Defendants' Undisputed Facts, ¶¶ 31, 33; Plaintiff's Response, p. 2. Steven Ruiz did, however, attend Robinson's autopsy. Plaintiff's Response, Ex. W, Deposition of Steven Ruiz (Ruiz Dep.), p. 85. Ruiz did not have supervisory duties over the staff on the day shift at Western on March 26, 2004. Defendants' Undisputed Facts, ¶ 36; Plaintiff's Response, p. 2. Ruiz was never told by any person prior to March 26, 2004 that there was trouble between Robinson and Moran, nor was he ever notified by anyone of any threat to the safety of Robinson. Defendants' Undisputed Facts, ¶¶ 34-35; Plaintiff's Response, p. 2.

According to Steven Ruiz, the coroner, who was also the Brown County Sheriff, called him and asked him to testify before the coroner's jury. Ruiz Dep., p. 65. Ruiz stated that he worked part-time for the Brown County Sheriff's Office and was, therefore, "accessible." Id. Ruiz asserts that, prior to appearing before the coroner's jury, he did not speak to any IDOC employee about the Robinson's death, but that he did review the incident reports that Western staff members had written about the incident. Id., p. 65, 72-73, 79-80. These reports were stored in a file in Ruiz's office.

Id., p. 73. Ruiz did not review any inmate reports of the incident. Id., p. 79.
Ruiz understood that he was going to the coroner's jury to testify about
Robinson's death. Id., p. 68. According to Ruiz, however, he was not
provided with a copy of the IDOC's internal investigation report prior to his
testimony before the coroner's jury or at any time prior to his deposition in
the instant case. Id., p. 69-71. It is undisputed that Steven Ruiz told
Western Warden Kevin Winters that he was going to testify at the
coroner's jury. Plaintiff's Response, p.42, Additional Material Facts, ¶ 97;
Defendants' Reply, p. 22, Response to Additional Material Fact 97.
According to Ruiz, Winters gave him approval or authority to testify. Ruiz
Dep., p. 66.

The transcript from the coroner's jury reflects that Steven Ruiz
testified that he was "a major and chief security" at Western. Coroner's
Jury Transcript, p. 3. Ruiz, however, has never been chief of security at
Western, and he does not recall telling the jury that he was chief of
security. Ruiz Dep., p. 82. Ruiz testified before the coroner's jury that he
was at the scene. Coroner's Jury Transcript, p. 4. Ruiz explained that he
was referring to the fact that he was at the scene a couple hours after
Robinson's death, when he was called in to work on March 26, 2004. Ruiz

Dep., p. 97. Ruiz admits that he made misstatements before the coroner's

jury. Defendants' Reply, p. 22, Response to Additional Material Fact 100.

For example, Ruiz stated that Moran and Robinson had been cell mates

for less than a month. Coroner's Jury Transcript, p. 5. Ruiz also misstated

that "There was medical attention rendered when the altercation began and

officers responded to break it up." Id., p. 5-6; Ruiz Dep., p. 103 (admitting

that the portion relating to medical attention was misstated). Ruiz testified

that "[a]s soon as [the guards] observed the altercation, they moved in to

separate the two and then summoned medical aid." Coroner's Jury

Transcript, p. 6-7. Ruiz explained in his deposition that this was "just

supposition." Ruiz Dep., p. 120.

Defendant Winters was Western's Warden from December 2002 to

October 2004. Defendants' Undisputed Facts, Attachment 1, p. 3-4,

Affidavit of Kevin Winters, ¶ 2. According to Winters, he was on-site at

Western at the time medical personnel were summoned to R-1 following

the fight between Robinson and Moran. Id., ¶ 3. Winters directed

Zimmerman and Majors McKee and Steven Ruiz to report to the scene.

Id., ¶ 5. Winters received notification that an inmate had died, and he

contacted IDOC Deputy Director Orr to advise him of the situation. Id., ¶ 6.

Page 32 of 62

Winters then went to R-1. Id., ¶ 7. Winters avers as follows:

> At no time prior to March 26, 2004, did I know either inmate
> Moran or inmate Robinson. I was never told, either by
> Robinson or Moran, or any other person, that they had
> problems with each other or that they had previously fought. I
> also was never aware that Michael Robinson was at risk of
> harm from Daniel Moran or any other person.

Id., ¶ 8.

Robinson was African-American, and Moran is Hispanic. Plaintiff has

presented evidence that some corrections officers at Western use

derogatory terms to refer to African-American inmates. Reynolds Dep., p.

138-39. There is, however, no evidence that any of the Defendants used

such terms. Plaintiff has presented the affidavit of Richard Corder, an

African-American Western inmate, who asserts that the corrections officers

at Western "hate the black inmates." Corder Aff., ¶ 15. Corder avers that

white corrections officers call black inmates by derogatory terms and talk to

them like they are dogs. Id. Corder's statements are general and do not

impute any such behavior to Defendants or any specific individual.

## ANALYSIS

Summary judgment is appropriate when "the pleadings, depositions,

answers to the interrogatories, and admissions on file, together with

affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c).  A genuine issue of material fact exists when "the

evidence is such that a reasonable jury could return a verdict for the

non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  The moving party has the initial burden of demonstrating the

absence of a genuine issue of material fact and that judgment as a matter

of law is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

When a properly supported motion for summary judgment has been made,

the party opposing summary judgment may not merely rest on the

pleadings but must "set forth specific facts showing that there is a genuine

issue for trial."  Fed. R. Civ. P. 56(e).  "A party must present more than

mere speculation or conjecture to defeat a summary judgment motion."  Liu

v. T & H Machine, Inc., 191 F.3d 790, 796 (7th Cir. 1999).  The Court must

consider the evidence in the light most favorable to the non-moving party,

here the Plaintiff, and draw all reasonable inferences in her favor.  See

Anderson, 477 U.S. at 255.

Plaintiff alleges that relief is appropriate under 42 U.S.C. §§ 1983 &

1985. In order to succeed under § 1983, Plaintiff must demonstrate that a

government official, acting under color of state law, deprived Robinson of a

right secured by the Constitution or laws of the United States.  In order to succeed under § 1985, Plaintiff must show a conspiracy to interfere with Robinson's civil rights.  Plaintiff's § 1983 claims arise out of the Eighth Amendment's prohibition against cruel and unusual punishment.  See U.S. Const. amend 8.  As the Seventh Circuit has recognized, "The Eighth Amendment protects against the infliction of 'cruel and unusual punishment.' Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners."  Mayoral v. Sheahan, 245 F.2d 934,  938 (7th Cir. 2001) (citing Langston v. Peters, 100 F.3d 1235 (7th Cir. 1996)).  The Supreme Court, in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), established a subjective deliberate indifference standard for measuring prison officials' conduct in Eighth Amendment cases involving harm from fellow inmates. Id at 825.   Under Farmer, liability attaches if a plaintiff can demonstrate that a defendant acted with "deliberate indifference," i.e., that he was subjectively aware of, but disregarded, a serious risk to a prisoner's health or safety.  Id. at 833.

A.  Official Capacity Claims

At the outset, the Court notes that Plaintiff's Complaint names each of the remaining Defendants in both their individual and official capacities and seeks only monetary, not injunctive, relief.  An official capacity suit is tantamount to a claim against the government entity itself.  See Kentucky v. Graham, 473 U.S. 159, 167 (1985).  As officials of the Illinois Department of Corrections, which is functionally the State of Illinois for purposes of § 1983, the defendants are not "persons" who can be sued in their official capacities for money damages under § 1983.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).  Plaintiff's § 1985 official capacity claims are similarly unavailing.  See Small v. Chao, 398 F.3d 894, 898 (7th Cir. 2005).  Therefore, Defendants are entitled to summary judgment on all of the remaining official capacity claims.

B.  Individual Capacity § 1983 Claims

Plaintiff asserts that Defendants Iseminger, Finch, Ashcraft, and Reynolds exhibited deliberate indifference to Robinson at the time of Moran's assault and that Defendants Winters, Funk, and Ashcraft were deliberately indifferent when they ignored cell change requests and visible injuries prior to the assault.  Defendants assert that summary judgment is

appropriate based on the fact that none of these Defendants had a

subjective awareness that Robinson was at risk of harm from Moran.

Alternatively, Defendants assert that they are entitled to qualified immunity.

Under Farmer, "a prison official cannot be found liable under the

Eighth Amendment for denying an inmate humane conditions of

confinement unless the official knows of and disregards an excessive risk

to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

The Seventh Circuit instructs that

> Proving that an officer was deliberately indifferent to the safety
> of a detainee requires "more than a showing of negligent or
> even grossly negligent behavior." The officer must have acted
> with "the equivalent of criminal recklessness." Prison officials
> who had actual awareness of a substantial risk to the health or
> safety of an inmate incur no liability if they "responded
> reasonably to the risk, even if the harm ultimately was not
> averted, because in that case it cannot be said that they were
> deliberately indifferent." The "mere failure of the prison official
> to choose the best course of action does not amount to a
> constitutional violation."

Guzman v. Sheahan, 495 F.3d 852, 857 (7th Cir. 2007) (internal citations

omitted). That the officer had actual knowledge of impending harm can be

inferred from circumstantial evidence. Farmer, 511 U.S. at 842.

Page 37 of 62

### 1. Defendant Reynolds

The Court turns first to Defendant Reynolds. Reynolds was the officer in the Bubble during the fight. According to Plaintiff, the risk to Robinson was obvious to Reynolds from the beginning of the fight until Robinson's death. It is undisputed that the corrections officer in the Bubble "can see down" B Wing. Plaintiff's Response, p.26, Additional Material Facts, ¶ 5 (not disputed in Defendants' Reply). However, as Defendants correctly assert, there is no evidence that Defendant Reynolds saw the fight in progress. In fact, Plaintiff has produced evidence that Reynolds sat with his back turned to the fight during the entire fight. Plaintiff's Response, p.35, Additional Material Facts, ¶ 61; Defendants' Reply, p. 15, Response to Additional Material Fact 61. Plaintiff further asserts that, during the time Moran stabbed Robinson, Reynolds was not paying any attention to B Wing. Plaintiff's Response, p.35, Additional Material Facts, ¶ 63; Defendants' Reply, p. 16, Response to Additional Material Fact 63.

Plaintiff asserts that a factual dispute exists as to whether Reynolds deliberately ignored an emergency button being activated during the assault. Reynolds concedes that the officer on duty in the Bubble is assigned to monitor the computer consoles that show when an emergency

button within a cell is pushed.  <u>Defendants' Undisputed Facts</u>, Attachment

1, p. 11-14, <u>Affidavit of Eric Reynolds</u>, ¶ 10.  Reynolds' Affidavit states that

when a cell is in access mode, such as during day room time, "the

'emergency' button simply opens the door and does not indicate in the

control area that the button has been pushed." <u>Id</u>.  In his deposition,

however, Reynolds testified that "on access if they can hit that buzzer they

are coming out the door," but that the light is the same whether the cells

are on lock down or not.  <u>Reynolds Dep.</u>, p. 73.  Plaintiff has presented

other evidence that the emergency buttons function during Day Room time.

<u>Ruiz Dep.</u>, p. 55.  It is undisputed that the panic buttons are kept in good

working order and function twenty-four hours a day.  <u>Plaintiff's Response</u>,

p. 27, <u>Additional Material Facts</u>, ¶ 9; <u>Defendants' Reply</u>, p. 3, Response to

Additional Material Fact 9.  Thus, viewed in the light most favorable to

Plaintiff, the evidence supports a finding that, if a cell emergency button is

pushed during Day Room time, a light would activate on the control panel.

    There is no evidence of any set procedures at Western regarding

response to the activation of the emergency call buttons; however, viewing

the evidence in the light most favorable to Plaintiff, when a light is

activated, the Bubble officer has a duty to "alert the officer on the floor to

check out and find out what the issue was." Ruiz Dep., p. 56. Moreover,

there is evidence that, when the control officer receives an emergency

button alert, someone is supposed to respond. Ashcraft Dep., p. 60.

Ashcraft also testified that a reasonable response time to the activation of

an emergency button would be a minute or a minute and a half. Ashcraft

Dep., p. 64.

Inmate Maas avers that he pushed the panic button in his cell when

Robinson and Moran were fighting in front of cell 55. Maas Aff., ¶ 8.

According to Maas, Robinson was still alive at this time and could have

been saved had a corrections officer responded and stopped the fight. Id.

Reynolds does not recall whether red lights lighted on the control panel

during the period from 8:00 to 9:30 a.m. on March 26, 2004. Reynolds

Dep., p. 69. It is clear, however, that Reynolds did not ask any officer to

respond to B Wing from 9:05 a.m. until Ashcraft called the Code 3.

Plaintiff relies heavily on Velez v. Johnson, 395 F.3d 732 (7th Cir.

2005), which is factually similar to the instant case.  Velez was

incarcerated in the Milwaukee County jail as a pretrial detainee.[4]  On the

---

[4]While a pretrial detainee's claim arises under the Fourteenth Amendment's Due
Process Clause, rather than the Eighth Amendment, the Seventh Circuit has
consistently noted that, there is "little practical difference between the two standards."
Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000).

evening of September 5, 1999, Johnson, a deputy sheriff, was working at the jail's control center, and was assigned to monitor emergency calls from inmates confined to their cells. Velez's cell mate placed a razor blade to Velez's neck. With the razor held to his neck, Velez pressed an emergency call button in his cell and informed Johnson that he was "not getting along" with his cell mate. Johnson asked Velez if he had requested a transfer. Velez replied "yes" but said that there was a conflict. Johnson took no further action. The Seventh Circuit specifically noted that Johnson failed to go check out the situation or ask the other guards to do so. Velez was then raped and battered by his cell mate.

Velez reached the Seventh Circuit after the district court denied Johnson's motion for summary judgment based on qualified immunity. The Seventh Circuit held that, viewing the facts in the light most favorable to the plaintiff, "Velez laid out facts that, if true, could support a finding of deliberate indifference." Velez, 395 F.3d at 735. Specifically, the Court held that facts existed sufficient to establish that Johnson knowingly disregarded warnings that a serious harm could occur as follows: (1) " Velez pushed an 'emergency call button;'" (2) "Johnson had no reason to doubt that there was an emergency, as Velez had no history of crying wolf

or abusing the call button;" (3) Velez specifically told Johnson that he was having a conflict with his cell mate; and (4) "Johnson was instructed to personally respond to emergencies." Id. at 736.

In the instant case, there is evidence that an emergency button was pushed on B Wing in the midst of the fight between Moran and Robinson and that there was no response by corrections officers. It is undisputed that Reynolds was monitoring the control panel connected to the emergency lights and that the panic buttons are kept in good working order and function twenty-four hours a day. While Reynolds does not recall whether the control panel activated during the time of the fight, as the Seventh Circuit has noted, it is inconsistent with Farmer to "reward guards who put their heads in the sand." Velez, 395 F.3d at 736. Questions of fact also exists as to the operation and significance of an emergency button activation during Day Room time. Reynolds himself has provided conflicting evidence regarding whether a light activates on the control panel when a cell button is pushed during Day Room time.

The significance of the activation is also unclear from the record. There is no evidence of set procedures governing in the event of an emergency button activation. Reynolds asserts that, when he was on duty

as the Bubble officer and a cell buzzer light activated, his usual response was to look in the direction of the cell to see if there was anything going on. According to Reynolds, if he did not see a problem, he would sometimes clear the light and wait to see whether it is reactivated before sending an officer to respond. Other evidence exists, however, that when a light is activated, the Bubble officer has a duty to alert the wing officer to check it out and in any event, someone is supposed to respond. Thus, questions of fact exist as to whether Reynolds knowingly disregarded the activation of an emergency call button and, if so, whether the activation of the emergency light constituted warning that a substantial risk of serious harm existed.

Reynolds, however, asserts that he is nevertheless entitled to summary judgment based on qualified immunity. Governmental actors performing discretionary functions are entitled to qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As set out by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 200 (2001), this Court applies a two-step approach in evaluating

a qualified immunity defense. First, the plaintiff must present evidence
that, taken in the light most favorable to the plaintiff, would allow a
reasonable fact finder to determine that he has been deprived of a
constitutional right. Id. at 201. If the plaintiff meets that burden, the Court
must determine whether the particular constitutional right was clearly
established at the time of the alleged violation. Id. If the right was clearly
established, the government actor is not entitled to qualified immunity.

As set forth above, viewing the evidence in the light most favorable to
Plaintiff, questions of fact exists regarding whether Reynolds failed to
respond to an emergency call button and if so, whether this conduct
constituted deliberate indifference. Viewing the evidence in the light most
favorable to Plaintiff, the first step of the Saucier inquiry is satisfied. The
issue at summary judgment thus becomes whether the right at issue was
clearly established at the time of the incident. The Court finds that it was
not.

It is Plaintiff's burden to demonstrate the existence of a clearly
established Constitutional right. Nanda v. Moss, 412 F.3d 836, 844 (7th
Cir. 2005). The Seventh Circuit has held as follows:

> To be "clearly established," the right in question must be
> "sufficiently clear that a reasonable official would understand

Page 44 of 62

> that what he is doing violates that right. This is not to say that
> an official action is protected by qualified immunity unless the
> very action in question has previously been held unlawful; but it
> is to say that in the light of pre-existing law the unlawfulness
> must be apparent."

Miller v. Jones, 444 F.3d 929, 934 (7th Cir. 2006) (quoting Anderson v.

Creighton, 483 U.S. 635, 640 (1987)). It has long been established that

the treatment a prisoner receives while incarcerated is subject to scrutiny

under the Eighth Amendment. See, e.g., Hudson v. Palmer, 468 U.S. 517

(1984). However, "the inquiry into whether a right is clearly established

'must be undertaken in light of the specific context of the case, not as a

broad general proposition.'" Borello v. Allison, 446 F.3d 742, 750 (7th Cir.

2006) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)). The

Seventh Circuit has expressly cautioned that "It is insufficient for a plaintiff

simply to point to a recognized constitutional right and claim that the right

has been violated." Id. The Seventh Circuit has recently explained, "A

plaintiff can show that a right is 'clearly established' by statute or

constitution in at least two ways: (1) he can point to an analogous case

establishing the right to be free from the conduct at issue; or (2) he can

show that the conduct was so egregious that no reasonable person could

have believed that it would not violate clearly established rights." Steidl v.

Fermon, 494 F.3d 623, 632 (7th Cir. 2007) (internal quotations and citation omitted).

As previously noted, Plaintiff relies heavily on Velez in asserting that Reynolds is precluded from receiving summary judgment. Velez, however, was decided in January 2005, after the incident at issue here. "The purpose of the second step of the qualified immunity analysis is to ensure that prison officials will not be held personally liable for their official conduct when they were not aware that their conduct violated any of an inmate's constitutional rights." Borello, 446 F.3d at 750. As was the case in Borello, Plaintiff has not attempted to compare the instant case to any factually similar one that had been decided prior to the incident at issue. Therefore, the Court must determine whether Reynolds' alleged actions were "'so egregious' that no reasonable person could have believed that they were permissible." Steidl, 494 F.3d at 632. The Court finds that the failure to respond to the activation of a cell call button, without more, does not constitute such an obvious violation of an inmate's constitutional rights that Reynolds should have been on notice that such action constituted deliberate indifference.[5] Therefore, Defendant Reynolds is entitled to

---

[5]While the Velez court denied summary judgment on qualified immunity grounds, Velez is factually distinguishable in several significant ways. At summary judgment,

3:06-cv-03058-BGC  # 172  Page 47 of 62

summary judgment on qualified immunity grounds on Plaintiff's § 1983 claims against him in his individual capacity.

## 2. Defendants Iseminger and Finch

The Court turns next to Defendants Iseminger and Finch. There is no evidence to support a finding that either Iseminger or Finch knew of any problems between Robinson and Moran prior to March 26, 2004. Plaintiff, however, asserts that Iseminger and Fink were aware of the substantial risk to Robinson from the beginning of the fight, yet failed to intervene to stop it. It is undisputed that both of these men were in the foyer during the fight between Robinson and Moran. It is undisputed that "[f]rom the foyer looking through the glass wall into B Wing a guard can see the upper gallery outside of cells B52, B53, B54, B55, B56, B57 and B58 where the fight between Moran and Robinson took place." Plaintiff's Response, p. 27, Additional Material Facts, ¶ 12 (not disputed in Defendants' Reply). It is also undisputed that "[f]rom the foyer, guards are able to hear yells from B Wing." Plaintiff's Response, p. 27, Additional Material Facts, ¶ 13 (not disputed in Defendants' Reply). There is, however, absolutely no evidence

---

Velez identified facts sufficient to establish that the defendant had no reason to doubt that there was an emergency, because Velez had no history of abusing the call button, and that Velez specifically told the defendant that he was having a conflict with his cell mate. The record in the instant case is devoid of similar facts.

Page 47 of 62

that either Iseminger or Finch saw or heard the fight.  While inmate Pickett avers that, "during the 20-25 minutes that [he] watched Mike Robinson and his cellie fight there were four corrections officers in the bubble who could see and hear the fight," he has no basis for testifying that the guards in the foyer actually saw or heard the fight.  Plaintiff's Response, Ex. E, Pickett Aff., ¶ 4.  Defendants present evidence that "prior to being notified by the two inmates on March 26, 2004, that an inmate needed medical care, [Isemeninger] did not see or hear anything unusual on B wing. [He] did not see any fight in progress, nor did [he] see any indication that inmates were, or had been fighting." Defendants' Undisputed Facts, Attachment 1, p. 18-20, Affidavit of Mark Iseminger (Iseminger Aff.), ¶ 14.  Similarly, the evidence relating to Defendant Finch is that "[he] did not know that there had been a fight on the wing until after the two inmates came to the wing door . . . ." Defendants' Undisputed Facts, Attachment 1, p. 21-23, Affidavit of Dustin Finch (Finch Aff.), ¶ 14.  This is consistent with Plaintiff's undisputed assertion that Iseminger and Finch were in the foyer with their backs towards B Wing and were not paying any attention to the wing at all during the fight.  Plaintiff's Response, p. 35, Additional Material Facts,

¶¶ 62 & 63; <u>Defendants' Reply</u>, p. 16, Response to Additional Material
Facts 62 & 63.

Similarly, viewing inmate Hope's assertion that a corrections officer
saw Robinson bleeding from the neck early in the fight and then left the
wing smiling and laughing as true, there is no evidence to link this
unidentified officer to Iseminger or Finch.  Hope estimates that the fight
lasted from 8:45 a.m. to 9:15 a.m.  The evidence is that both Iseminger
and Finch were on B Wing during this approximate time.  However, there is
no evidence that these were the only officers on B Wing during this time.
Moreover, Finch avers that when he did his wing check at 9:05 a.m. he did
not observe blood on any inmate, and Iseminger states that he "did not
observe any blood on an inmate prior to finding Robinson lying on the
upper deck of B Wing."  <u>Finch Aff.</u>, ¶ 9; <u>Iseminger Aff.</u>, ¶ 14.  Hope's
statement is insufficient to create a triable issue of fact on the question of
whether <u>Iseminger or Finch</u> actually saw Robinson bleeding from the neck
early in the fight.

The "actual knowledge" prong of the deliberate indifference prong is
significant because the Eighth Amendment relates only to cruel and

unusual "punishment." Farmer, 511 U.S. at 837. The Seventh Circuit has

instructed

it is not enough that the official should have known of a
substantial risk or that a reasonable officer in the situation
would have known of the risk. The [Farmer] Court insisted that
negligence on the part of the officer is insufficient to impose
liability: [A]n official's failure to alleviate a significant risk that he
should have perceived but did not, while no cause for
commendation, cannot under our cases be condemned as the
infliction of punishment.

Haley v. Gross, 86 F.3d 630, 641 (7th Cir. 1996) (internal quotations and

citations omitted).

"Whether a prison official had the requisite knowledge of a

substantial risk is a question of fact subject to demonstration in the usual

ways, including inference from circumstantial evidence, and a factfinder

may conclude that a prison official knew of a substantial risk from the very

fact that the risk was obvious." Farmer, 511 U.S. at 842; see also Haley,

86 F.3d at 641 ("While a jury is not required to infer actual knowledge from

the conspicuous nature of a risk, it is allowed to do so."). In the instant

case, Plaintiff fails to identify sufficient evidence from which a reasonable

jury could conclude that Iseminger and/or Finch were aware of a

substantial risk of harm to Robinson but failed to act. Plaintiff presents

evidence that the fight was accompanied by loud noise on B Wing. Inmate

Green avers that, at approximately 9:00 a.m. on march 26, 2004, he heard "a loud crash as a t.v. busted" and that he "could see four corrections officers standing in the bubble where they must have been able to hear the loud crash." Plaintiff's Response, Ex. B., Green Aff., ¶ 5. Inmate Pickett avers that the noise from the t.v. being thrown "was extremely loud, loud enough to be heard in the bubble through the intercom." Plaintiff's Response, Ex. E., Pickett Aff., ¶ 6. These and other inmates aver that there was also loud yelling and sounds of fighting on the wing. There is, however, no evidence to support a finding that Finch or Iseminger actually heard these sounds or knew, based on the noise, that there was a fight in progress on B Wing. While deliberate indifference can be shown with circumstantial evidence, evidence that the officers should have realized that a fight was going on based on sound emanating from B Wing but did not is insufficient to establish that the officers acted recklessly. Farmer, 511 U.S. at 844. Under Haley it is not enough that Iseminger and Finch under the situation should have known of the substantial risk, or that a reasonable correctional officer under the situation would have known of the risk. Under Haley, Iseminger's and Finch's failure to alleviate a significant risk that each should have perceived, but did not, cannot be condemned as

the infliction of punishment.   Even if such conduct can be shown to

constitute negligence, proof of mere negligence is insufficient to support a

claim of deliberate indifference under the Eighth Amendment.   Defendants

Iseminger and Finch are entitled to summary judgment on Plaintiff's §1983

deliberate indifference claims.[6]

### 3.  Defendant Ashcraft

Plaintiff asserts that Defendant Ashcraft exhibited deliberate

indifference both at the time of the assault by failing to intervene and prior

to it by ignoring requests for a cell change and visible injuries to Robinson.

The Court turns first to the time prior to the assault.  While there is

evidence that Robinson and Moran had visible injuries from prior

altercations, there is no evidence that Ashcraft was aware of these injuries.

The mere evidence of prior injury is insufficient to establish that Ashcraft

---

[6]The Court has diligently searched for cases involving analogous fact patterns. In doing so, the Court became aware of Leer v. Murphy, in which the Ninth Circuit Court of Appeals affirmed summary judgment in favor of prison officials in a case arising out of two inmate stabbings. Leer, 844 F.2d 628 (9th Cir. 1988). In Leer, the Court cautioned that, when plaintiffs seek to hold individual defendants personally liable for damages, the inquiry into the causal connection between the deliberate indifference and the constitutional deprivation must be refined to the extent that plaintiffs must establish individual fault on the part of each defendant. Id. at 633-34. The Leer Court affirmed summary judgment based on the fact that the plaintiffs failed to allege facts sufficient to demonstrate that any particular prison official was the actual and proximate cause of any constitutional violation. Id. Similarly, in the instant case, Plaintiff has failed to identify facts sufficient to support a finding of a causal connection between Finch and/or Iseminger's conduct and any constitutional violation.

was aware of facts from which the inference could be drawn that a

substantial risk of serious harm to Robinson existed.  Indeed, Plaintiff

concedes that "Ashcraft never witnessed a fight between Robinson and

Moran on March 24, 2006 or any other date, and was unaware that a fight

of any kind had occurred prior to being called by inmates on the wing at

approximately 9:14 a.m." <u>Defendants' Undisputed Facts</u>, ¶ 58; <u>Plaintiff's</u>

<u>Response</u>, p. 2.  Given the record, prior visible injuries cannot serve as a

basis for liability for Defendant Ashcraft.

      With respect to the cell change request, it is undisputed that

"Ashcraft could not grant routine cell changes . . . ." <u>Defendants'</u>

<u>Undisputed Facts</u>, ¶ 63; <u>Plaintiff's Response</u>, p. 2.  Ashcraft avers that cell

change requests are submitted to the placement office and that the

placement office would make a cell change if it was approved.  <u>Ashcraft</u>

<u>Aff.</u>, ¶¶ 15, 16.  Ashcraft stated, however, that his practice "was if an

inmate wanted a cell mate change, he could talk to [Ashcraft].  If that

happened, [Ashcraft] would ask what the problem was, if they could stay

for a few days, and if they could find someone else they wanted to cell

with." <u>Id.</u>, ¶ 15.  Ashcraft further asserts that "[if] an inmate believed he

was in danger in the cell into which he was assigned, he could refuse

housing, at which point [Ashcraft] would walk him to segregation . . . ."
Id., ¶ 17.

Defendants proffer as an undisputed fact that "Ashcraft never
received a cell change request, either written or verbal, from either Moran
or Robinson." Defendants' Undisputed Facts, ¶ 71 (citing Ashcraft Aff.,
¶ 20).  Plaintiff lists Defendants' Undisputed Facts, ¶ 71 as disputed;
however, in support, Plaintiff cites only evidence that inmate Parker told
Ashcraft that Robinson was having trouble with his cell mate.  Plaintiff's
Response, p. 7 (citing Plaintiff's Response, Ex. F, Parker Aff., ¶ 12); see
also Local Rule 7.1(D)(2)(b)(2).  This is insufficient to create a question of
fact as to whether Ashcraft ever received a cell change request from
Moran or Robinson.  Given the record, there is no evidence that Ashcraft
received but failed to act on a cell change request from Robinson or
Moran.  Pope v. Shafer, 86 F.3d 90 (7th Cir. 1996), upon which Plaintiff
relies is distinguishable on this basis.

A question of fact exists, however, as to whether Ashcraft was
aware, based on information received from inmate Parker, that Moran
constituted a substantial threat to Robinson.  Parker avers that, in February
2004, he told Ashcraft that Robinson was "having trouble with his

roommate," that Parker was worried Robinson would get hurt, that

"Robinson and his roommate are about to fight," and that "this is serious.

Robinson's gonna get hurt."  <u>Plaintiff's Response</u>, Ex. F, <u>Parker Aff.</u>, ¶ 12.

Ashcraft denies this, but at this point, the Court must view the evidence in

the light most favorable to Plaintiff.  Even under this standard, however, the

evidence is insufficient to establish that Ashcraft was subjectively aware of,

but disregarded, a serious risk to a Robinson's safety.  In reaching this

conclusion, the Court relies on <u>Riccardo v. Rausch</u>, 375 F.3d 521 (7th Cir.

2004), in which the Seventh Circuit overturned a jury verdict against a

corrections officer in a § 1983 case arising out of the Eighth Amendment.

In <u>Riccardo</u>, the Seventh Circuit recognized that prison guards "must

discriminate between serious risks of harm and feigned or imagined ones,

which is not an easy task given the brief time and scant information

available to make each of the many decisions that fill every day's work."

375 F.3d at  525.  The Court held that the Eighth Amendment "does not

demand that guards perform this task flawlessly. It does not even hold

them to the negligence standard. Liability is possible, instead, only when a

guard is deliberately indifferent to a substantial risk of serious harm."  <u>Id</u>.

(citing cases).  According to the Seventh Circuit, "'Deliberate indifference'

means subjective awareness. . . . It is not enough . . . that the guard ought to have recognized the risk. Instead, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. at 526 (citing Farmer, 511 U.S. at 837). In the instant case, there is no direct evidence to support a finding that Ashcraft actually recognized that Moran constituted a risk to Robinson. Moreover, objective indicators did not substantiate Parker's perceptions. See id. at 528 ("a prisoner's bare assertion is not enough to make the guard subjectively aware of a risk, if the objective indicators do not substantiate the inmate's assertion"). Robinson and Moran were housed together for six months prior to the fight. During this period, they did not request a cell change from Ashcraft or refuse housing based on safety concerns. Plaintiff fails to point to evidence sufficient to support a finding that Ashcraft actually recognized that Moran constituted a risk to Robinson prior to the time of the assault.

Turning to the time of the assault, Plaintiff argues that the risk to Robinson was obvious to Ashcraft from the beginning of the fight until Robinson's death. Plaintiff, however, concedes that "Ashcraft never witnessed a fight between Robinson and Moran on March 24, 2006 or any

other date, and was unaware that a fight of any kind had occurred prior to
being called by inmates on the wing at approximately 9:14 a.m."
Defendants' Undisputed Facts, ¶ 58; Plaintiff's Response, p. 2.  There is
no evidence that Ashcraft failed to respond reasonably at that point.

Additionally, the record evidence regarding Ashcraft's location during
the time of the fight differs from the evidence relating to Finch and
Iseminger.  Ashcraft testified that he was exiting his office, entering the
foyer, when the two inmates came to the foyer door.  Ashcraft Dep., p. 82.
Plaintiff asserts that Ashcraft was in the foyer during the fight, relying on
Finch's deposition testimony.  In deed, Finch testified that Ashcraft was in
the foyer between approximately 9:05 a.m. and the time the two inmates
came to summon help.  Finch Dep., p. 59-60.  Finch, however, did not
recall where Ashcraft was in the foyer, but testified that Ashcraft was not
talking to Finch and Iseminger.  Id.  There is no evidence that Ashcraft was
in the same location as Iseminger and Finch.  Ashcraft's office is described
both as "off the foyer" or "in between A and B wing in the foyer."  Ashcraft
Dep., p. 41.  While statements from other witnesses place up to four
corrections officers in the foyer, none of these expressly identify Ashcraft
or give his location.  Given this evidence, together with Plaintiff's

concession, Plaintiff fails to identify any evidence from which a reasonable

jury could infer that Ashcraft was aware of the fight prior to the time at

which the inmates came to the wing door.  Thus, Ashcraft is entitled to

summary judgment on Plaintiff's § 1983 deliberate indifference claims.

### 4.  Defendants Funk and Winters

Plaintiff asserts that Defendants Funk and Winters exhibited

deliberate indifference by ignoring requests for a cell change and visible

injuries to Robinson.  Defendants Funk and Winters assert that they did not

have any personal involvement with Robinson prior to his death.  The

Court turns first to Defendant Funk.  Plaintiff does not dispute that "Funk's

only involvement in this case came after the death of Michael Robinson . . .

." Defendants' Undisputed Facts, ¶ 2; Plaintiff's Response, p. 2.  There is

no evidence that Funk was aware of any visible injuries that Robinson or

Moran may have displayed from prior altercations.  With respect to the cell

change request, inmate Corder avers that, on March 24 or 25, 2004,

Robinson stated "Hey why can't I get a cell change?  I went through all the

proper procedures.  I asked the Sergeant and the Major and the Assistant

Wardens and the Warden." Plaintiff's Response, Ex. A, Corder Aff., ¶ 5.

This statement does not identify Funk, nor does it support a finding that

Funk, as an assistant warden, was informed that Moran constituted a risk to Robinson's safety.  Plaintiff fails to identify any evidence from which a reasonable jury could infer that Funk disregarded a known risk to Robinson's safety.  Funk is, therefore, entitled to summary judgment on Plaintiff's § 1983 deliberate indifference claims.

Plaintiff's claims against Winters are similarly unavailing.  Again, there is no evidence in the record that could support a finding that Winters was aware of any visible injuries that Robinson or Moran may have displayed from prior altercations.  Additionally, it is undisputed that Winters does not determine where an inmate is to be housed.  <u>Defendants'</u> <u>Undisputed Facts</u>, ¶ 21 (not disputed in Plaintiff's Response). Defendants have presented evidence that cell change requests are submitted to the placement office and that the placement office would make a cell change if it was approved.  <u>Ashcraft Aff.</u>, ¶¶ 15, 16.  There is no evidence that Winters is aware of cell change requests that have been submitted to the placement office.  Even viewing inmate Corder's assertion that Robinson stated that he asked "the Warden" for a cell change as true, this evidence is insufficient to support a finding that Winters was informed that Moran constituted a risk to Robinson's safety.  <u>See</u> <u>Plaintiff's Response</u>, Ex. A,

3:06-cv-03058-BGC  # 172  Page 60 of 62

Corder Aff., ¶ 5. Plaintiff fails to identify any evidence from which a reasonable jury could infer that Winters disregarded a known risk to Robinson's safety. Winters is entitled to summary judgment on Plaintiff's § 1983 deliberate indifference claims.

     C.  Individual Capacity § 1985 Claims

     According to Plaintiff, § 1985 relief is appropriate based on the allegation that all of the remaining defendants engaged in a conspiracy to violate Robinson's civil rights. Complaint, Count V. Plaintiff's Response alleges that following Robinson's death, Defendants engaged in a conspiracy to cover up the deliberate indifference that led to his death, thus interfering with Robinson's right of access to the courts. Plaintiff's Response, p. 65. In order to establish a civil conspiracy under § 1985, Plaintiff must show that an actual conspiracy existed (i.e, that people agreed to injure Robinson), that its purpose was to deprive Robinson of his constitutional rights, that an act was committed in furtherance of the conspiracy, and that Robinson was injured. Alexander v. City of South Bend, 433 F.3d 550, 556-57 (7th Cir. 2006). "A conspiratorial agreement may be established by circumstantial evidence, but only if a reasonable

Page 60 of 62

jury could conclude that the conspirators had, in fact, reached an understanding . . . ." Id. at 557.

Plaintiff fails to identify any evidence that could support a finding that a conspiratorial agreement existed in the instant case. Viewing the evidence in the light most favorable to Plaintiff, (1) at one point, a printout recording the timing of the opening and closing of the door between the foyer and B Wing existed and its disappearance cannot be explained; (2) Funk was evasive when dealing with Plaintiff and referred her to the Brown County Coroner's inquest; (3) Funk may have mentioned to the coroner that Plaintiff would attend the inquest; (4) Steven Ruiz testified at the inquest and gave false information; and (5) Warden Winters authorized or approved Ruiz's appearance before the coroner's jury. See Plaintiff's Response, p. 65-70. Plaintiff fails to identify any evidence that could link Defendants Finch, Ashcraft, Iseminger, or Reynolds to the alleged conspiracy, and they are thus entitled to summary judgment on the § 1985 claims. Furthermore, the evidence relating to Defendants Funk, Ruiz, and Winters is insufficient to overcome summary judgment, even when viewed in the light most favorable to Plaintiff. While in some respects shocking, the allegations against these three defendants in no way support a finding

of an agreement, an essential element of the § 1985 claims.  Therefore,

Defendants are entitled to summary judgment on all of Plaintiff's § 1985

claims.

## CONCLUSION

THEREFORE, the Motion for Summary Judgment (d/e 147) filed by

Defendants Steve Ashcraft, Dustin Finch, Sandra Funk, Mark Iseminger,

Eric Reynolds, Steven Ruiz, Roger E. Walker, Jr., and Kevin Winters is

ALLOWED, in part, and DENIED, in part.  The Motion is denied as moot as

to Defendant Walker, who has been dismissed from the case.  The Motion

is allowed in all other respects.   Summary judgment is granted in favor of

Defendants Steve Ashcraft, Dustin Finch, Sandra Funk, Mark Iseminger,

Eric Reynolds, Steven Ruiz and Kevin Winters and against Plaintiff Bonnie

Robinson, Independent Administrator of the Estate of Michael J. Robinson.

All pending motions are denied as moot.  THIS CASE IS CLOSED.

IT IS THEREFORE SO ORDERED.

ENTER:   March 5, 2008

FOR THE COURT:

*s/ Byron G. Cudmore*

BYRON G. CUDMORE
UNITED STATE MAGISTRATE JUDGE